EDWARD KING *vs.* ADELORE O. BELMORE.

Plymouth.    January 17, 1924. — February 27, 1924.

Present: RUGG, C.J., DECOURCY, CROSBY, PIERCE, & CARROLL, JJ.

*Negligence*, Of physician or surgeon, Res ipsa loquitur.  *Physician and
Surgeon.  Practice, Civil,* Conduct of trial: erroneous instruction
leaving to jury issue as to which there is no evidence and no contention
by parties; Exceptions.  *Evidence,* Presumptions and burden of proof;
Opinion: expert.

Upon evidence at the trial of an action against a physician for injuries
alleged to have resulted from negligence of the defendant in treating
an open wound upon the plaintiff's leg, tending to show that the de-
fendant carelessly dressed the wound and failed properly to keep it
clean, by reason of which an infected or septic condition resulted making
it necessary for the plaintiff's leg to be amputated, it was *held*, that a
motion by the defendant that a verdict be ordered in his favor properly
was denied and that the questions, whether in the exercise of reason-
able skill the defendant should have discovered the plaintiff's condition
and whether the defendant in the circumstances was skilful, were for
the jury.

At the trial of the action above described, it appeared that the defendant
had not discovered a fracture of the leg.  The evidence was undis-
puted that such failure did not result in the loss of the leg, and the
plaintiff's counsel so stated in his argument.  The trial judge refused
to grant requests by the defendant that he charge the jury that they
could not find that the failure of the defendant to discover the fracture
was a cause of his condition resulting in the amputation of his leg, and
that on all the evidence the failure of the defendant to discover the
fracture was not evidence of want of skill, knowledge or care on his
part; and, having called attention to the fact that the plaintiff's counsel
made no claim based on the defendant's failure to discover the fracture,
charged the jury in substance that, if they were satisfied that the
fracture did cause the loss of the leg, they must find the defendant
negligent.  *Held,* that the failure to give the instructions requested by
the defendant and the instructions given in the charge were errors
prejudicial to the defendant.

It was error, at the trial of the action above described, for the trial judge
to refuse a request by the defendant for an instruction to the jury that
" The fact that the plaintiff suffered sepsis and amputation of his leg
does not even raise a presumption of want of proper care, skill or negli-
gence on the part of the defendant in his treatment of the plaintiff."

At the trial of the action above described, there was evidence that the
defendant used certain " dust cloths " and strips from sheets furnished
him by the plaintiff's mother in bandaging the wound.  There was no

evidence to show, and the plaintiff's counsel did not contend at the trial, that such cloths and sheets were unsanitary and improper for such use. The plaintiff and his mother testified that the dust cloths had been washed and were clean. The defendant requested and the judge refused to rule that " Even if the jury find that the defendant used the cloths described by the plaintiff and his mother and in the manner by them described, there is no evidence that such use caused or contributed to the septic condition of the plaintiff." *Held*, that the refusal of the ruling was error prejudicial to the defendant.

Certain questions, asked of medical experts at the trial of the action above described, were *held* to have been permitted within a proper exercise of discretion by the trial judge.

TORT for personal injuries alleged to have resulted from negligence of the defendant as a physician in treating the plaintiff. Writ dated October 15, 1919.

In the Superior Court, the action was tried before *Walsh*, J. Material evidence is described in the opinion. At the close of the evidence, the defendant moved that a verdict be entered in his favor. The motion was denied. The defendant then asked for the following rulings:

" 1. Upon all the evidence the plaintiff is not entitled to recover."

" 6. Upon all the evidence the jury cannot find that the failure of the defendant to discover a fracture of the fibula resulted in any septic condition of the plaintiff, and was not the cause, or the contributing cause, of the condition of the plaintiff which resulted in amputation of his leg.

" 7. The fact that the plaintiff suffered sepsis and amputation of his leg does not even raise a presumption of want of proper care, skill or negligence on the part of the defendant in his treatment of the plaintiff.

" 8. Even if the jury find that the defendant used the cloths described by the plaintiff and his mother and in the manner by them described, there is no evidence that such use caused or contributed to the septic condition of the plaintiff.

" 9. Upon all the evidence the plaintiff received the cause of his subsequent septicemia on the street at the time of his original injury, and there is no evidence in this case that said sepsis could have been avoided, prevented or cured by this defendant or by any other physician no matter how skilful.

" 10. Upon all the evidence the failure of the defendant to discover the fractured fibula is no evidence of want of skill, knowledge or care on his part.

" 11. There is no evidence that the defendant carelessly, negligently or improperly caused or allowed the plaintiff to be or become septic."

The rulings were refused. The jury found for the plaintiff in the sum of $7,000. The defendant alleged exceptions.

The case was submitted on briefs.

*F. G. Katzmann, J. P. Vahey & R. Clapp*, for the defendant.

*W. G. Rowe*, for the plaintiff.

CROSBY, J. This is an action of tort against the defendant, a physician and surgeon, for malpractice in treating the plaintiff for an injury resulting from being run down by a motorcycle.

Immediately after the accident, which occurred on November 6, 1918, the plaintiff was taken to the defendant's office. The defendant examined him and found an open wound on the calf of the right leg; he dressed the wound and thereafter attended him on different days until November 16, 1918; and two days later he was dismissed from the case by the plaintiff. Dr. Hunt, another physician, was then called, who treated the plaintiff until March 5, 1919, when he was removed to a hospital and there, on April 2 following, his right leg was amputated at a point six inches below the hip.

There was evidence tending to show that the cut or wound had become infected or septic; and that pus had formed above the wound and discharged through it. Dr. Hunt testified that the proper treatment for such an injury would be for the attending physician to wash off all possible cause of infection by the use of a corrosive or bichloride solution; to open and clean the edges of a wound such as the plaintiff had received, and clean the open parts with gauze dipped in such solution, following which to suture the wound with stitches; that after it had been cleaned to apply an iodoform gauze bandage, and assuming that the plaintiff had lost considerable blood to apply absorbent cotton next outside

the iodoform gauze and place outside the absorbent cotton a bandage of aseptic surgical gauze. He further testified that, while pus is not always possible to detect until several days after an open wound has been received, the most common period for its appearance is from three to eight days following the receipt of a street injury, and that " Generally after an accident a physician would know whether pus had come or not within about three days." This witness also testified that " When pus forms an avenue of escape should be open; if there is a wound you separate the edges of the wound, . . . Drainage should be established. If there is no evacuation, septic absorption follows, which may cause septicemia and ultimate death. Usually the development of pus causes an increase in temperature." Dr. Barrett testified that he was chief of the surgical service of the Brockton Hospital; that he " would expect infection introduced in a wound to manifest itself inside of a very short period, three or four days." There was evidence that the defendant did not place a drain in the wound; that he put a white powder on it; that he never took the plaintiff's temperature; that in the afternoon of November 16, after the defendant saw the plaintiff for the last time, about a cup of pus came from the wound under the bandage.

Dr. Hunt testified that he first visited the plaintiff on November 18, 1918; that he was emaciated; that he took his temperature and found that he had a fever; that he removed what seemed to be a strip of sheeting from his leg; that there was no iodoform bandage there; that there was a scab underneath the sheeting, and evidence of the application of a white powder; that he removed the scab and found the edges of a small wound somewhat glued together; that he pulled the edges apart and there was a very profuse discharge of pus. He further testified as follows: " I found on the outer side of the lower third of the thigh a bulged condition which fluctuated on pressure, and which appeared to be a well of pus, which discharged through the wound below, when the wound was open; . . . I established drainage of the pus, tilted the leg down and propped the patient up in bed. · The pus soaked all the clothes we

had in the bed, through the sheets and on to the mattress. From the emaciated condition of the patient and the amount of pus I should say the pus condition was eight or ten days old. There was no drain in the wound, I inserted a drain and put on a wet dressing with a weak lysol solution. The scab covered the wound. The evacuation of the pus eased the plaintiff's pain; pus under pressure causes pain, and there was pressure there." There was further medical evidence to the effect that sepsis might have been caused by contamination of the wound after the accident, by faulty method and care in the way of infected bandages or instruments, or unskilfulness of any kind. Dr. Packard, another witness called by the plaintiff, testified that "pus takes three or four days before you would get much of any evidence of it."

Upon the testimony of the defendant it could have been found that the care and treatment which he administered to the plaintiff were skilful and proper; but the jury were not obliged to believe his testimony, and could have found that the wound was infected, and that pus had formed after the accident. It was for them to determine whether in the exercise of reasonable skill the defendant should have discovered the condition of the plaintiff, and whether the treatment under the circumstances was skilful or otherwise. It is uncontroverted that the defendant did not learn at any time during his attendance upon the plaintiff that pus had formed or that there was a fracture of the fibula, as appears from the undisputed testimony.

While the defendant testified that, when he first saw the plaintiff at his office, the first thing he did after looking at the wound was to cut his trousers and underdrawers from the bottom to the hip with scissors, and that otherwise he would not have been able thoroughly to clean and treat the injury, there was testimony from other witnesses that the trousers were not cut or slit as described by the defendant. If the jury found that the wound was treated without either removing or cutting the trousers, they could have found that it was not cleaned at that time so as to avoid infection.

It is manifest that upon all the evidence the defendant's

motion for a directed verdict could not have been allowed; and that the jury could not properly have been instructed that the plaintiff was not entitled to recover. That was a question of fact to be determined upon the evidence with reasonable inferences which might be drawn therefrom. It was for the jury to say whether the defendant exercised such skill and care as members of his profession ordinarily would have exercised under corresponding conditions. *Chesley* v. *Durant,* 243 Mass. 180, and cases cited.

The defendant, however, was entitled to have his sixth and tenth requests given, in substance. Instead of giving these requests the trial judge charged the jury as follows: " The fact that the leg was fractured, as shown by the X-ray plate, need not trouble you to any great extent, in view of the fact that it is not claimed, as stated by counsel,— it is not now claimed, if it ever was claimed that the fracture of the fibula caused the loss of the leg. There was a fracture, apparently, of the fibula; the X-ray plate shows it. It was not discovered, as I recall the testimony, until sometime around the fifteenth or nineteenth of December. Dr. Goddard, I think, was called by Dr. Hunt, who came after Dr. Belmore, the defendant, was told not to come again, and it was then discovered that this small bone in the lower leg had a fracture; and you have heard the physicians testify what crepitus is — the grating of the two ends of the bone; but it is not claimed that that fracture caused the loss of the leg. So that, unless you are satisfied from the evidence, gentlemen, here in this case, in spite of the fact that it is not so claimed, — unless you are satisfied from all the evidence in the case that this fracture did cause the loss of this leg, it is not important with reference to that particular aspect of the case; but if you do so find, why, then it will be necessary, if you so find from all the evidence in the case, notwithstanding the fact that it is not so claimed, notwithstanding what the experts have testified, if you do then find that this fracture of the leg caused the plaintiff's condition, it will be necessary for you then to consider what treatment, if any, at any time may have been given for this fracture, because if there was no treatment given by Dr.

Belmore and none by Dr. Hunt and none by Dr. Goddard, it will be necessary for you to find that Dr. Belmore was negligent in not discovering this fracture, and that it existed at the time and could have been discovered; but, as I have said, unless you find, in spite of the fact that it is not claimed, that it had anything to do with the loss of the leg, and notwithstanding the opinion of the experts, that aspect of the case need not give you further concern." Four medical experts, called by the plaintiff, testified in substance that the fracture of the fibula had nothing whatever to do with sepsis in the leg. The plaintiff's counsel in his argument to the jury stated that it was not claimed that the failure of the defendant to discover the fracture was the cause of the infection which resulted in the loss of the leg, and that it was probable that the plaintiff received an initial infection at the time of the injury from some germ from the street. Apart from this statement to the jury the undisputed testimony shows that the failure of the defendant to discover and treat the fracture did not result in any septic condition, nor was there any evidence that it was a cause or a contributing cause of the condition of the plaintiff which resulted in the amputation of his leg. As these instructions were erroneous and prejudicial to the defendant the exception to this part of the charge must be sustained.

The seventh request, that the fact that the plaintiff suffered sepsis and amputation of his leg did not raise a presumption of want of proper care, skill or negligence on the part of the defendant in his treatment of the plaintiff, in substance should also have been given.

There was evidence that the defendant used certain " dust cloths " and strips from sheets furnished him by the plaintiff's mother in bandaging the wound. But there was no evidence to show, and the plaintiff's counsel did not contend at the trial, that such cloths and sheets were unsanitary or improper for such use. The plaintiff and his mother testified the dust cloths had been washed and were clean. Accordingly the defendant's eighth request in substance should have been given.

The exceptions to the admission of evidence cannot be

sustained.   They all arose from the admission of questions calling for expert medical opinion.   In dealing with such questions much must be left to the discretion of the trial court; and his rulings will not be revised unless they are plainly prejudicial to the rights of the excepting party, which does not appear in the case at bar.

*Exceptions sustained.*